

FILED
LODGED
RECEIVED

UNITED STATES DISTRICT COURT
[Insert District, e.g., Western District of Washington]

JAN 14 2026

AFFIDAVIT OF SABRINA GENE COHN

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

Personal Information

BY

DEPUTY

My name is Sabrina Gene Cohn. I reside at 404 101st Ave SE, E25, Lake Stevens, WA 98258. I am over the age of eighteen and competent to testify.

Summary of Events

Throughout January, February, and March 2025, all CPS intakes against me concerned my child, R████ G███ R███-C███ R███, reportedly having small bruises on her legs, hip, and arm. R████ was born on ███████ ██, ████, in Everett, Washington, and is currently three and a half years old. She is an active, playful child, and such bruises are typical for her age and activity level.

On January 12, 2025, I last saw R████ when I returned her to her father, Derek Michael Raatz, born ███████, ████, at 7:00 PM, at 10924 53rd Ave W, Mukilteo, WA 98275, as part of our care arrangement from December 26, 2024, through January 17, 2025. Derek and I have filed a parenting plan under case number 25-3-00033-31, and although it has not yet been finalized, we continue to follow it in our co-parenting arrangement.

On January 16, 2025, Jessica Lipscombs, an employee of the Early Learning Center of Lake Stevens School District, called CPS reporting concerns about small bruises on R████. Despite R████ being solely in Derek Raatz's custody, Monroe DCYF issued founded findings against me for child abuse or neglect on January 16, February 7, and February 20, 2025, without lawful investigation, due process, or court order.

On February 7, 2025, Monroe DCYF sent confidential documents regarding my family and household to the Lake Stevens Police Department, resulting in incident report number 2025-00002462. This report falsely claimed that I was arrested on February 7, 2025, when in fact, I was not arrested until March 31, 2025. The report also lists involvement by Lake Stevens Police Officers Wayne Ackerman, Chad Wells, Michael Hingtgen, Craig Valvick, and Crystal Kolomyza, in addition to Matthew Walters.

On March 26, 2025, a Zoom meeting was held including CPS caseworkers Kelly Daniels and Sean Wolter, Monica Kristiansen, Amber Burwell, teacher Trisha Romans, and Steve Burleigh. Derek Raatz did not attend the meeting due to illness. I was the only parent present and was continually interrupted, over-talked, and denied the opportunity to fully present my position or defend myself.

On March 28, 2025, Lake Stevens Police Officer Crystal Kolomyza and CPS caseworker Kelly Daniels interviewed R████ at her school without my consent or knowledge. R██████ principal, Matthew Wyant, was present during this interview.

On March 31, 2025, I was arrested by Lake Stevens Police Officers Matthew Walters, Wayne Ackerman, Chad Wells, Michael Hingtgen, Craig Valvick, and Crystal Kolomyza. During the arrest, I was denied the ability to secure my home, which was left wide open. These officers unlawfully removed R████ from my custody without a court order and allowed CPS to place her with her father, Derek Raatz.

On April 3, 2025, CPS caseworker Kelly Daniels advised Derek Raatz to place a protection order against me due to my arrest on March 31, 2025. Derek Raatz subsequently filed for a protection order under case number 25-2-03035-31.

On April 4, 2025, CPS caseworker Sean Wolter unlawfully entered my home again without a warrant or court order.

On April 28, 2025, I spoke with CPS worker Sandra Jewell, questioning why I was founded for incidents when R████ was not in my care. Sandra Jewell admitted that CPS mistakenly believed I had full custody and was unaware of my co-parenting arrangement with Derek Raatz since R████ was six months old.

On May 7, 2025, Derek Raatz had an open CPS investigation due to new bruises found on R████. Derek sent photos to CPS caseworker Sean Wolter, who instructed Derek to seek medical attention but took no further action.

On May 12, 2025, I spoke with CPS caseworker Sean Wolter, who confirmed that CPS had never obtained a court order or judicial authorization to remove or transfer R████ from my custody. Sean Wolter also told me that if Derek Raatz is founded on child abuse or neglect, Monroe DCYF will be required to hold a meeting to determine whether R████ will be placed in their case or mine, due to the existing founded findings against me.

I am scheduled for a prehearing on July 28, 2025, to challenge these wrongful findings.

Constitutional Violations

Fourth Amendment Violations:

- Unlawful searches and seizures without lawful cause or judicial oversight.
- Unlawful removal of my child without court order, judicial review, or emergency circumstances.
- Unlawful seizure and disclosure of private family records.
- Unlawful interview of my child at school without my consent or knowledge.

Fourteenth Amendment Violations:

- Denial of due process and unlawful removal of my child from my custody without court order or hearing.
- False and retaliatory findings of abuse or neglect.
- Failure to verify custody status before issuing findings.
- Denial of meaningful participation in the March 26, 2025, Zoom meeting.
- Fabrication of official records.
- Disparate treatment and retaliation.
- Conducting interviews of my child at school without my knowledge or lawful consent.
- Ongoing retaliation, false findings, and denial of equal protection.

Statement of Harm

As a direct result of these constitutional violations, I have suffered:

- Emotional distress and mental anguish.
- Invasion of privacy.
- Reputational damage and public humiliation.
- Disruption and unlawful interference with my family life and custody rights.
- Loss of liberty due to unlawful arrest.
- Exposure to inhumane and unsanitary jail conditions.
- Loss of income due to being unlawfully detained.
- Aggravation of my autoimmune condition (Sjogren's syndrome).

Relief Requested

I respectfully request that this affidavit be considered in support of my federal civil rights complaint, including:

- Overturning the CPS findings of abuse and neglect;
- Restoration of shared custody rights;
- Injunctive relief to prevent further unlawful entries or removals;
- Compensation for emotional, physical, and financial harm;
- Federal oversight or investigation into the conduct of CPS and Lake Stevens Police.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15 day of _May_ , 2025, in Lake Stevens, Washington.

Sabrina Gene Cohn
Affiant

NOTARY ACKNOWLEDGMENT

State of Washington
County of Snohomish

Subscribed and sworn to before me on this 15ᵗʰ day of _May_____, 2025, by Sabrina Gene
Cohn, who is personally known to me or has produced _Drivers License_ as identification.

[Seal]

Notary Public Signature: _Herbert T. Wash_____
My Commission Expires: _02/27/2026_____

```
HERBERT T WASHBURN
NOTARY PUBLIC #116841
STATE OF WASHINGTON
COMMISSION EXPIRES
FEBRUARY 27, 2026
```



Kolomayz

Crystal Kolomyzia ‼️

12:57

Friday, March 25

Delivered 9:09 AM

Nothing conclusive? What does that mean

Delivered 9:58 AM

Nothing distinguishable

Could they still be fingerprints?

Delivered 10:08 AM

I don't know if this could help you be lately raven been scared to go to school

Delivered 10:14 AM

They could be. Ok thanks

Delivered 10:16 AM

The 24th she was scared of thr teacher's aid and used me as a shield to keep her away

10:18 AM

Yes sorry I've been on another case. Nothing conclusive

9:05 AM

| Logon | Search | Person Search Results | | | | Logoff | Change Role/Court | Help |

**True Name:** COHN, SABRINA GENE          Alias: COHN, SABRINA G ∨  14 Cases          ICH  DCH  PDCH

| AKA | Party | Case Number | Crt | Date | Short Title | DV | Jg | DR | O | CD | W | P | C | BAL |
|-----|-------|-------------|-----|------|-------------|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| | DEF | PC25-0593 SNA PC | EVD | 02/07/2025 | PC ASSAULT OF CHILD 2ND DEGREE | Y | D | FD | E | CL | | | | |
| | | | | 02/07/2025 | PC ASSAULT OF CHILD 3RD DEGREE | Y | D | FD | | | | | | |
| | DEF | 5884A25F SNA CF | EVD | 01/16/2025 | ASSAULT OF CHILD 2ND DEGREE | N | D | RW | | CL | | | | |
| | | | | 01/16/2025 | ASSAULT OF CHILD 3RD DEGREE | N | D | RW | | | | | | |
| | PET | 25-2-04865-7 | S31 | 05/27/2025 | CIVIL PROTECTION ORDERS | Y | | A | | | | | | |
| | PET | 25-2-03473-7 | S31 | 04/15/2025 | CIVIL PROTECTION ORDERS | Y | | D | | CM | | | | |
| | RSP | 25-2-03035-9 | S31 | 04/03/2025 | CIVIL PROTECTION ORDERS | Y | | A | | CM | | | | |
| | PET | 25-3-00033-0 | S31 | 01/07/2025 | PARENTING PLAN/CHILD SUPPORT | N | | | | | | | | |
| A | MNR | 01-2-00575-2 | S15 | 09/04/2001 | UNLAWFUL HARASSMENT | N | | E | | CM | | | | |
| A | MNR | 01-2-00574-4 | S15 | 09/04/2001 | UNLAWFUL HARASSMENT | N | | E | | CM | | | | |
| A | MNR | 01-2-00573-6 | S15 | 09/04/2001 | DOMESTIC VIOLENCE | Y | | A | | CM | | | | |

| Logon | Search | Person Search Results | | | | Logoff | Change Role/Court | Help |



# United States Department of the Interior

### BUREAU OF INDIAN AFFAIRS
Puget Sound Agency
2707 Colby Ave. - Suite 1101
Everett, Washington  98201-3665
(425) 258-2651



FILED

AUG 1 1 2021

SNO. CO. DISTRICT COURT
EVERETT DIVISION

July 17, 2014

Ms. Sabrina Gene Cohn
PO Box 61
Clinton, WA  98236

Dear Mr. Cohn:

This letter is to confirm that your father, Reuel Edward Cohn, participated in the Snoqualmie judgment under PL 92-30 Act of May 29, 1967. (81 Stat. 30-42): Docket 93. He was determined to be the great-great-great-grandson of Chief Pat-Ka-nam and shared in the distribution of the funds to those descendants of members of the Snoqualmie and Skykomish Tribes, as they were constituted in 1855. As such, you would be the great-great-great-great-granddaughter of Chief Pat-Ka-nam. Chief Pat-Ka-naum of the Snoqualmie, Snoqualmoo, and Snohomish and other tribes signed the Point Elliott Treaty.

If you have any questions, please call Connie Johnston, Tribal Enrollment Specialist, at (425) 258-2651. Thank you.

Sincerely,

Don Chamberlain
Acting Superintendent

You will also note that most of our meetings held with the
Indians were at night or on Saturdays and Sundays, to suit the con-
venience of the Indians, and the employees of Western Washington deserve
much credit for their efforts to present the facts and record the Indian
reactions on the withdrawal proposals.  I had the same team of two
employees handle the meetings with each group to eliminate confusion
and misunderstanding as well as promote efficiency and accuracy.
It is my opinion that we have covered very carefully and effectively,
all of the propositions and proposals contained in the proposed bill
for government withdrawal and that it is now up to the various bands,
tribes or groups, with their attorneys, to present to Congress any
further ideas or proposals they may have on government withdrawal
legislation.  Further, much of our regular agency work has suffered
from neglect since we had to concentrate on the proposed withdrawal
legislation, so that I feel that we should now devote our efforts to
the regular work as we have covered each band, tribe or group, and
documented their reaction, and there should be no further occasion
for more meetings with the Indians on the proposal.

Very truly yours,

Raymond H. Bitney,
Superintendent

cc - Area Director, Portland

Encl. (2)

REPRODUCED AT THE NATIONAL ARCHIVES

Tribes, Inc. has never been able to create a membership census roll and have it approved in accordance with their constitution under the Indian Reorganization Act. The record will show that some of the officers and members of the Tulalip Tribes, Inc. belong to tribes who are under other treaties than the Point Elliott Treaty and yet these same people claim that the Indian Reorganization Act gives them treaty rights to control tribal rights and tribal properties on the Tulalip or Snohomish Reservation. The Tulalip, or Snohomish Reservation, was created under the treaty, along with the Suquamish, Lummi and Swinomish Reservations, for "The Duwamish and other allied tribes" so that the four reservations so created, belong to all of the signers of the treaties, and not to any one group who happened to be allotted on the reservation. Therefore, it follows that any tribal properties or authorities or rights created under the treaty would belong to all of the descendants of the signers of the Point Elliott Treaty of 1855. I call this to your attention as there seems to be much confusion and misinformation relative the Tulalip Tribes, Inc. who are a community organization under the Indian Reorganization Act and not a treaty tribe.

The meeting of November 7 was held with the Tulalip Tribes, Inc. at the old Tulalip Agency and was attended by the "members" of the Tulalip Tribes, Inc. as well as Mr. R. H. Hutchinson and Mr. Albert Jackson, who represented the Western Washington Agency, and presented the contents of the proposed bill for the fourth time to this group. The reaction of the members was about the same as before—a small group want to perpetuate themselves in power and continue the present organization, controlling tribal property and treaty rights over which they have no authority. Mr. Lewis Bell, the general attorney for the Tulalip Tribes, Inc., was present and took an active part in the discussion and deliberations on the proposed bill.

In the meeting of November 14, 1953, we find some nineteen bands, tribes or groups represented by members, which also included the Tulalip Tribes, Inc., who ran the meeting and dominated it. Again Messrs. Hutchinson and Jackson represented the Western Washington Agency and presented the proposed bill for consideration and discussion. You will note that most of the tribes, bands or groups had their claims attorneys present and Mr. Post in particular, one of them, entered actively in the discussion and deliberations.

There was nothing new developed insofar as Indian attitude was concerned in this meeting despite the fact some nineteen tribes, bands or groups were represented. You will note that this is the ninth meeting held with many of those present, as many have attended every meeting held in this area on the proposed withdrawal bill.

2

REPRODUCED AT THE NATIONAL ARCHIVES

UNITED STATES
DEPARTMENT OF THE INTERIOR

OFFICE OF INDIAN AFFAIRS
Field Service
Western Washington Indian Agency
P. O. Box 915
Everett, Wash.

Division of Program

November 28, 1953

A I R   M A I L

BUREAU OF INDIAN AFFAIRS
RECEIVED
NOV 30 1953
Washington, D. C.

Commissioner of Indian Affairs

Washington, 25, D. C.

Dear Sir:

This will refer to Office air mail letter of November 23,
1953, citation "Division of Program" addressed to Area Director Pryse
relative any comments, suggestions, changes or recommendations on
suggested changes in the proposed Western Washington readjustment bill.
The last paragraph states, "We note also that on page 48 in Mr. Bitney's
Report on Conferences with Indians he refers to two additional Indian
meetings to be held November 7 and November 14. It is important, to
complete the record in this office, that we receive information on
the positions taken on the bill by the Indians at these meetings."
On November 25, 1953, in response to your letter, Area Director Pryse
states, "Superintendent Bitney of Western Washington Agency has been
requested to inform you direct of the results of the meetings he had
on November 7 and November 14." This letter was received at 3:30 P.M.
yesterday and we are transmitting reports on the above cited meetings
of November 7 and November 14, held with the Tulalip Tribes, Inc. at
the old agency at Tulalip.

The Tulalip Tribes, Inc. is a community group organized
under the Indian Reorganization Act and is supposed to be composed
of the people with Indian blood who reside on the Tulalip Reservation.
There is no Tulalip Tribe and never has been, so that the group has
no treaty rights, no aboriginal rights or authority to take over
properties or authorities created under the Point Elliott Treaty of
1855. Some of the individuals, as individuals, who have ancestors
who signed the treaty, have treaty rights, but the Tulalip Tribes, Inc.,
as an organization, has no treaty rights or authorities, despite the
fact that they have attempted to assume treaty rights and take over
the control of tribal property created under the treaty. The Tulalip

VICTORY
BUY
UNITED
STATES
WAR
BONDS
AND
STAMPS

RG 75, West Wash
16666-53-013, A.1-A
59A643, Box 92

14



December 2, 2024

Dear Parents,

We have a family emergency, Grandma Daycare, Virginia needs to show up in person at the US embassy in the Philippines for my sister's visa interview scheduled next month. So kindly allow us to take some time off from December 26th to January 17th. I really appreciate your consideration and understanding for this matter. Thank you very much.

Sincerely,

Mildred Van Wechel

‹ **Daycare**
3:31 PM, Mar 12

We are closed on the following
State-observed holidays:
New Year's Day
Martin Luther King Jr. Day
President's Day
Memorial Day
Juneteenth
Independence Day
Labor Day
Veteran's Day
Thanksgiving Day
The Friday following the Thanksgiving
Day
December 25

*** other closures are to be determined.
There will be a month notice
given depending on the situation/
circumstances.

Copy text      Share      More.

Screenshot of holidays they are closed.

2025 Calendar

with derek

Derek
Drop off
Derek CPS
Drop off
Derek
Drop off
Drop off

Drop off 2
Derek CPS
Drop
Drop
CPS
Derek
Drop off

Drop off
Derek
Drop off
Derek

Derek
Derek
Derek
Visit
Derek
Eye Exam
Visit CPS
Derek
Visit
Derek

Derek
Derek
Derek
Derek
Visit
Derek
Derek

Derek
Eye doctor?
Derek
Visit
Derek
Derek

Derek
Visit
Visit
Derek
Derek





## PSYCHOLOGICAL SERVICES

| TULALIP HEALTH SYSTEM | HEALTH CLINIC |
|---|---|
| **BEHAVIORAL HEALTH & RECOVERY** | 7520 TOTEM BEACH RD<br>TULALIP, WA 98271<br>(360) 716-4511<br>(425) 259-8626 |

This report is confidential in nature and is part of the clinical record of this client. This document may not be released (i.e., discussed, copies provided, etc.) to any third party without proper authorization. This report is for professional use. If raw data are included within this report, only qualified professionals with training and experience in this area should attempt to interpret the information. This report is based on the information available to the evaluator at the time of the assessment and findings were interpreted as relevant to the referral question(s). Hence, the use of this report by unauthorized individuals, at a future date for other purposes is not recommended as it may significantly limit the validity of the findings.

### Psychological Evaluation

### Confidential

Name: Sabrina Gene Cohn

DOB: ~~02/00/1000~~

Gender: Female

Ethnicity: Native American

Evaluation Dates: Sept.-Nov. 2025

Date of Report: Nov. 6, 2025

Name of Evaluator: Shellah Imperio, Ph.D.

### <u>Referral Question and Presenting Problems</u>

Sabrina Gene Cohn, a 30-year-old, Native-American, single female, mother to one child, was referred for a psychological evaluation by her Tulalip health care provider (Dr. Jean Reid) to help aid in her diagnostic clarification. Ms. Cohn shared that she had an IEP from the Mukilteo School District beginning from Kindergarten to 12th grade and was also in speech classes. She added that Mariner High School had already destroyed her IEP records and the family records of her IEP was lost due to a house fire in 2015. She reported that her last evaluation was in 2013. She reported that she is currently dealing with Child Protected Services and is struggling in communicating with them, especially as they don't seem to understand "her with her child."

When asked about current concerns, she reported: she has problems focusing, is easily distracted, problems with memory (has to be reminded at least 4x), has to slow down at times, and problems with comprehension."

Specifically, the current evaluation aims to answer the following questions:

   a.  What is Ms. Cohn's current cognitive ability?
   b.  What are her mental health diagnoses?
   c.  What are her strengths and weaknesses?

**<u>Evaluation Method</u>**

<u>Interviews</u>

Sabrina Cohn (Client)

Travis Hailey (Boyfriend)

<u>Records Reviewed</u>

EPIC (Electronic Health Record)

Psychological Services Referral Form

<u>Tests Administered</u>

Child Abuse Potential Inventory (CAPI)

Comprehensive Executive Function Inventory Adult ( Observer and Self-Report)

Minnesota Multiphasic Personality Inventory-3rd Edition (MMPI-3)

Rotter Incomplete Sentences Blank

Sentence Completion Series (Parenting Form)

Symptom Checklist-90 Revised (SCL-90R)

Wechsler Adult Intelligence Scale-5th Edition (WAIS-5)

Wechsler Individual Achievement Test-4th Edition (WIAT-4)

World Health Organization Disability Assessment Schedule 2.0 (WHODAS 2.0)

Parent-Child Observation (October 15, 2025; Tulalip Health Clinic)

**<u>Background Information</u>**

Ms. Cohn's background history is based on the clinical interview with Ms. Cohn and from review of records including, EPIC. Ms. Cohn's parents are Valaire Cook-Cohn and Reuel Cohn. She was born Edmonds, WA and grew up in Whidbey Island, WA. After grandfather's death in 2000, the family moved to Everett, WA. She reported that her father has intellectual disability

(has preschool reading level; alleges that father is "mentally age 5 and has problems in writing as well). She added that father is on State Disability and has had multiple heart attack, stroke and bypass surgery. She has an older half-sister, a brother and younger sister. She said that "we never grew up together; we just shared the same Dad." She reported having a normal sibling rivalry. She added that outside of school, they only watched educational shows and some cartoons as their mother wanted to make sure that "we were learning more." She said that similar to her, her younger brother also received Special Education services. On the other hand, her sister did online schooling due to getting hurt in PE during middle school.

Ms. Cohn reported that she had moved in with her child's father, Derek Raatz in 2018, in Mukilteo, WA, then to Lake Stevens in 2022 after their daughter, R█████ was born. She reported kicking him out the home in 2022. Ms. Cohn currently resides in an apartment in Lake Stevens, WA, and previously had her daughter, R█████ C██████ R█████ (4 years old), doing regular visits with her prior to CPS' involvement. When asked what led to the problems with CPS, she reported the following: she stated that she was involved with them on January 16, 2025, after daughter was found to have "bruising all over her hip" while she was in father's care and as a result, R█████ school contacted CPS. It should be noted that R█████ is "non-verbal." Ms. Cohn shared that she hasn't gotten R█████ tested as her father (Derek) has custody of her. She added that the school police got involved and she told them that "R█████ was with her Dad as she had been with him around December 2024 while she was at mother's care from January 11 and she didn't see any bruise at that time.' She mentioned that R█████ stayed at father's home till 7 pm January 17, 2025. She added that CPS had sent the paperwork to the police and as a result, Ms. Cohn and ex-partner Derek went to the police for interviews and at that time, Ms. Cohn was "arrested for 28 hours." She stated that Derek "wasn't arrested as he is out of district." She reported that the initial charges were: "assault of a child (2nd and 3rd degree) and that eventually, everything got dismissed." She added that she found faulty charges and that she filed charges. She indicated that she had asked the police and CPS to "go slow about what was being said to her, "and said that they denied it. When asked if she can get a lawyer, "she was told she couldn't get a lawyer as she wasn't convicted unless she was going to pay for it herself." She shared that she was not understanding the questions of the police during the interviews and that she even offered the police to check the camera at her house and "they said I was already convicted." She stated that there is a current protection order between her and ex-parter and that visits with her and daughter, R█████ are supervised by her mother (visits are once weekly). In addition to problems with CPS, she also has problems with housing.

When asked how she is at home, she shared that her mother has indicated that she is like her father. "I have to repeat myself a lot." When asked what this means, she stated that, "my brain is fast, but my brain has to slow down to understand others." She added that "I am good at multi-tasking (such as at work) but I have problems with concentration ("I zone out" per report from my bf and neighbors)." Travis has noted that "I see others take advantage of her kindness," and that he tries to be a mediator with R█████ father as he had witnessed some of the scare tactic used by Derek in the past against Ms. Cohn. He also mentioned that it is hard for Ms. Cohn to retain information when more than 2 people are speaking to her.

When asked about abuse history, Ms. Cohn shared, "I experienced physical abuse from Dad, he was overwhelmed taking care of 2 children (me and brother) and a toddler (younger sister) especially as my mother worked a lot, he hit us with a belt." Then with her ex-partner (and father of R█████), Derek (from 2018-2022), she reported that there was DV, sexual, physical and emotional abuse. She continued to describe him as "very controlling and would go with me to doctor's appointments so that I would not be able to ask for help." Also, he became physically aggressive when I didn't make payments on the wi-fi so he could not play his videogames. He was also "financially abusive towards me and his other family member." She shared that in 2020 when he thought she was leaving, he "got me pregnant."

When asked about her strengths, Ms. Cohn shared "I see good in people; I try to focus on the positive and I enjoy being a mother." Her mother stated that Ms. Cohn "doesn't give up and she keeps trying. Since she was little, she doesn't stop. She mentioned that she experiences pain and fatigue, which she inherited from her father (also the intellectual disability)." She went on to elaborate that Ms. Cohn has struggled with reading, writing, and comprehension. Despite this, she is very good with her daughter and her daughter's needs 1st. Grandmother noted that "r█████ doesn't want to go back to father after their visit."

## Medical and Psychological History

Information regarding Ms. Cohn's medical and psychological history is based on review of records and from the clinical interview with Ms. Cohn. She has been to the doctor for various reasons including thickening of her nails (toe), concussion without loss of consciousness, viral syndrome, bronchitis, chronic low back pain, acute vaginitis, irregular menses, upper respiratory infection, chronic left knee pain, abdominal pain during 1st trimester in pregnancy, high blood pressure with pregnancy, routine prenatal appointments, allergic reaction to drug, left wrist and thumb pain, recurrent sore throat, chronic tonsillitis, gastroenteritis, abdominal pain, elevated liver enzymes. As a result, she reported that she will have a genetic testing in Seattle soon as her liver is acting up (said she has had liver biopsy previously). She also reported that she has Sjogren's syndrome is a chronic autoimmune disorder where the body's immune system attacks the glands that produce tears and saliva, leading to dry eyes and dry mouth. Ms. Cohn has received physical therapy due to **chronic midline low back pain without sciatica** and regarding surgery history, she has had tonsillectomy and septorhinoplasty in the past.  She is allergic to amoxicillin and t-dap shot.

 Regarding mental health services, Ms. Cohn has also participated in group therapy and has been diagnosed with PTSD, Depression (Unspecified Type), Anxiety Disorder (Unspecified Type), and has been prescribed buspar. She is currently in therapy with Center for Human Services since 2021.

## Academic History

Ms. Cohn's academic history is based on the clinical interview with Ms. Cohn. She reported that her problems at school started in kindergarten and that "I was too slow for the class." She added that she was tested, had an IEP but that her mother didn't want her to be on an IEP and that her mother was threatened by the school if she did not receive Special Education services, then CPS

will get involve with the children, and as a result, her mother consented. She went to high school in Mariner High School (Mukilteo School District). As mentioned elsewhere in this report, she received Special Education services from K-12 and denied any behavioral problems in the past.

## Legal History

Information regarding Ms. Cohn's legal history is based on the clinical interview with Ms. Cohn, herself. She reported that her legal history is primarily with CPS. She has been involved with CPS in February 2022 after previous partner's sister called CPS on her due to her "postpartum depression." Other CPS involvement happened in 2024 after she had cut Derek out of her life and he could not come to the  house and "he teamed up with one of the neighbors, and acted to be in a relation with her and instead, retaliated on me, and called CPS on made false accusations about me and the CPS result: nothing was conclusive." The most recent CPS involvement is the current case (January 2025).

## Drug History

Information regarding Ms. Cohn's drug history is based on the clinical interview with Ms. Cohn and from the review of records. She  reports that she has never smoked. She has never used smokeless tobacco. She reports previous alcohol use. She reports that she does not use drugs.

## Employment History

Information regarding Ms. Cohn's employment history is based on her clinical interview. She currently works at Taco Bell for the last 3 years (on-call, varied schedule, and no discipline record) and stated that "I do food orders." She added, "I sometimes ask customers to repeat the orders but I have no issues with my coworkers." She reported working at Auto Zone (customer sales) from 2017-2019 and stated that she was terminated after she was involved in a car accident and couldn't clock in on time at work. She also worked at AM & PM convenience store from 2019-2021 and due to complications in her pregnancy, "I had to be in bedrest, and they will not accommodate me so I left." She added also working straight out of high school at Walmart (seasonal cashier).

## Relationship History

Information regarding Ms. Cohn's relationship history is based on the clinical interview with her. She has had various romantic relationships in the past, including when she was 17 years old, which lasted for 6 months. She said that her partner wanted to hide the relationship and later found out that he had gotten someone pregnant. Then at age 20, she was with someone (Jesse) for 2 years and the relationship didn't last very long as her parents didn't like him as they thought he was "using her for her money." She reported that "he was an alcoholic, on disability, and abused me financially." Then at age 22, similar with Jesse, she got together with Timothy, whom she reported also "used me for money, and relationship lasted 6 months." Then in 2019, she shared meeting Derek (Raven's father)and stated that "he used me for my money, was also on disability; we lived together at his Dad's house, he fought with his dad so I don't pay rent but instead, he got almost my entire paycheck; he was abusive emotionally; he had erratic mood, had threatening behaviors) and sated that she ended the relationship in 2022. Then in 2024, she met

her current partner, Travis, she stated that "he is great, helps me out, helps me financially, and is a helpful support system."

## Mental Status Examination

Ms. Cohn is a 30-year-old Native American single female, mother of one child. She was observed in multiple testing sessions. She dressed appropriately, maintained appropriate contact, was alert, engaged and cooperative. Her thought content was not delusional. When asked about current suicidal and homicidal thought and behaviors, she denied any. However, she reported having past suicidal ideation in 2011 to 2013 when "I was overweight, and people made fun of me also because of my Dad, and also, because of my smell or that I was like a gorilla; the neighborhood kids were horrible." During that time, she mentioned developing an eating disorder and depression. When asked about hallucinations and delusions, she stated that she had some paranoia that "someone wanted to get me, that Derek wants to keep controlling me, especially with the DV relationship that we had." She added that he told her, "Raven will not have another step-father and demanded that I date him again February of 2025." She denied being in a psychiatric hospital before.

## Test Results

Ms. Cohn was administered various tests to assess her current cognitive, achievement, executive, psychological and parenting functioning. Tests results are considered as valid unless noted otherwise.

Cognitive functioning: Ms. Cohn was administered various tests to assess his cognitive, achievement, and executive functioning. Her cognitive abilities were measured using the Wechsler Adult Intelligence Scale-5th Edition (WAIS-5). It is a widely used test of cognitive ability for individuals between the ages of 16 to 90. A person's overall cognitive ability (FSIQ) can be inferred from her performance on a series of tasks. The tasks measure different aspects of cognitive functioning and seven primary subtests assess cognitive abilities across five domains: verbal comprehension, visual spatial, fluid reasoning, working memory, and processing speed. Performance on individual subtests also provides information about specific skills, strengths and weaknesses. Although this FSIQ score represents an estimate of Ms. Cohn' general intellectual ability, it does not give much information regarding individual strengths or weaknesses, nor does it give the total picture of her cognitive functioning. It is also important to remember that performance on a single subtest does not provide a complete cognitive profile either. Research shows that intelligence is a complex and multifaceted construct. Therefore, it's necessary to consider and compare performance across multiple subtests and indices to gain a more comprehensive understanding of an individual's cognitive strengths and weaknesses.

Ms. Cohn' general cognitive ability is within the **Below Average** range of intellectual functioning, as measured by the FSIQ (**FSIQ=80**; CI =76-86). Her FSIQ is similar to peers which suggests commensurate reasoning skills, problem solving abilities, learning rate, and memory capacity with sufficient intellectual functioning. Individuals with closer to average Full Scale IQ scores tend to be equipped with the necessary cognitive skills to meet with success in a typical environment. In daily life, she is able to generally manage tasks like planning, decision-

making, and problem-solving competently, but may need support when facing unfamiliar or complex challenges that require advanced critical thinking.

**WAIS-5**

| Scale | Composite Score | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|
| Verbal Comprehension | 79 | 8 | 73-88 | Very Low |
| Visual Spatial | 96 | 39 | 89-104 | Average |
| Perceptual Reasoning | 87 | 19 | 81-95 | Below Average |
| Working Memory | 72 | 3 | 67-81 | Very Low |
| Processing Speed | 94 | 34 | 86-103 | Average |
| Full Scale IQ | 80 | 9 | 76-86 | Below Average |
| General Ability | 81 | 10 | 76-87 | Below Average |

**Subtest Score Summary**

| Subtest Name | Scaled Score | Percentile Rank |
|---|---|---|
| Similarities | 6 | 9 |
| Vocabulary | 6 | 9 |
| Block Design | 8 | 25 |
| Visual Puzzle | 10 | 50 |
| Matrix Reasoning | 9 | 37 |
| Figure Weights | 6 | 9 |
| Digit Sequencing | 6 | 9 |
| Running Digits | 5 | 5 |
| Digits Forward | 5 | 5 |
| Coding | 8 | 25 |
| Symbol Search | 10 | 50 |

The **Verbal Comprehension Index (VCI = 79**; 8th Percentile; **Very Low** range), a measure of crystallized intelligence, represents Ms. Cohn' ability to reason with previously learned information. Specifically, the VCI provides an overall estimate of an individual's verbal abilities, including vocabulary development, verbal reasoning, and comprehension. This index reflects how well Ms. Cohn can understand, access, and use word knowledge at this stage of life— whether that knowledge has been acquired through formal education, self-directed learning, or

everyday experiences. The VCI highlights how effectively a person can verbally express meaningful ideas, apply language to solve problems, and make sense of verbal information. Performance on this index is shaped by multiple factors, such as educational background, exposure to enriching environments, language development history, and cultural experiences. Expressive and receptive language abilities—how well an individual understands what is said to her and how clearly, she can express herself—also plays an important role in performance. Tasks in this area primarily assess crystallized intelligence which reflects the ability to use previously learned verbal and conceptual knowledge. This score reflects Ms. Cohn' score in verbalizing meaningful concepts, thinking about verbal information, and expressing herself using words and it fell in the **Very Low** range. Her performance on the Verbal Comprehension Index was lower than her peers. When an individual performs at a low level on the VCI, it suggests difficulty with vocabulary development, verbal concept formation, and expressive language skills. In everyday life, low VCI scores may correspond to difficulties understanding nuanced language, such as sarcasm or implied meanings, and expressing ideas in an organized or detailed way during social or practical conversations.

The **Visual Spatial Index** (VSI) is specifically designed to measure how well someone can take in visual material, analyze it, and replicate it. It assesses nonverbal concept formation, visual perception and organization, visual-motor coordination, and the capacity to differentiate between the main subject and the background in visual stimuli. It focuses on how well individuals can interpret, organize, and process visual information. Performance in this domain reflects an individual's ability to generate, perceive, analyze, interpret, store, retrieve, manipulate, and think with visual patterns and stimuli. It requires the individual to pay close attention to details, identify distinguishing details between similar images, figure out how different parts relate to a whole, and replicate two dimensional geometric designs using three dimensional objects. Individuals' performance on these tasks reflects their capacity to visualize relationships between parts of a whole, make sense of abstract visual data, and apply that knowledge in various academic, work, and daily life situations. It also measures nonverbal, fluid reasoning abilities, spatial processing and attentiveness to detail. Ms. Cohn' VSI score was in the 39th percentile and is in the **Average** range (PRI = 96). Individuals who score around the average range on the Visual Spatial Index possess typical abilities in visual analysis, pattern recognition, and spatial reasoning. In daily life, she can handle basic visual-spatial tasks like following directions, assembling products, or visualizing objects and spaces, though she may occasionally encounter challenges with highly detailed or intricate tasks, such as navigation in unfamiliar locations or working with complex visual instructions. Two primary subtests from the WAIS-5 contributed to her overall VSI score: Block Design and Visual Puzzles. She performed comparably on the two subtests. In daily life, though she is more likely to be able to handle basic visual-spatial tasks like following directions, assembling products, or visualizing objects and spaces, she may occasionally experience challenges with highly detailed or more intricate tasks such as navigation of unfamiliar locations or working with complex visual instructions.

The **Fluid Reasoning Index** assesses Ms. Cohn' ability to engage in novel problem-solving, abstract thinking, and logical analysis without relying on previously acquired knowledge. This index captures fluid intelligence—the mental agility needed to adapt to unfamiliar challenges by identifying patterns, evaluating relationships, and applying reasoning strategies. Fluid reasoning is widely regarded as a core component of general intelligence, supporting tasks that demand

flexible thinking, inductive and deductive reasoning, and the ability to form concepts or rules from visual or conceptual information. Individuals are asked to solve puzzles, complete patterns, or balance conceptual equations, all of which measure their capacity to think logically and abstractly in real-time. Tasks within this index require more than rote memory—they involve seeing beyond surface features, organizing fragmented pieces of information, and applying structured reasoning to reach a conclusion. Fluid reasoning also draws upon visual-spatial processing, verbal comprehension, and mental flexibility, highlighting the brain's ability to "think on its feet." For adolescents and adults alike, this skill set plays a key role in academic learning, job performance, and everyday problem-solving. The FRI score is based on performance in two primary subtests—Matrix Reasoning and Figure Weights. Her FRI score was in the 19th percentile and in the **Below Average** range (FRI = 87). Individuals scoring in the around average range on the FRI have typical abilities in problem-solving, logical thinking, and pattern recognition. In everyday life, she can solve routine problems and adapt to change, though she may occasionally find it more challenging to navigate unfamiliar situations or produce quick solutions without prior experience. With practice and support, she can improve her problem-solving abilities and strengthen her capacity for fluid reasoning. The two subtests that make up the FRI index were comparable.

The **Working Memory Index** (WMI) measures Ms. Cohn' ability to register, maintain, and manipulate visual and auditory information as well as her ability to recognize, store, mentally manipulate, and recall information over short periods of time. It requires immediate perceptual and linguistic processing, attention to detail, and concentration. Short-term memory, which includes both memory span and working memory, plays a critical role in learning and problem-solving. Memory span reflects the ability to attend to and recall ordered information after a single presentation, while working memory involves temporarily holding and manipulating information under divided attention demands. Strong working memory skills are essential for tasks that require sustained attention, real-time problem-solving, and the integration of new information. Two primary subtests from the WAIS 5, Digit Sequencing and Running Digits (also (Digits Forward), contribute to an overall Working Memory Index score while five other subtests offer additional insights in this area. Her performance placed herm into the 3rd percentile (WMI =72; **Very Low** range). Her Working Memory Index score was lower than peers which implies that it may be difficult for her to retain newly learned auditory and visual information. Those with low WMI scores may struggle to retain and manipulate verbal or numerical information in real time, especially when asked to do so under pressure or with distractions present. This can impact the ability to follow multi-step directions, perform mental arithmetic, or understand complex language structures. In everyday life, she is likely to frequently forget names, dates, or tasks she is intended to complete and may rely heavily on written notes, alarms, or reminders to manage daily responsibilities. Accommodations like breaking down tasks into smaller parts, using visual aids, or allowing extra time can significantly improve functioning and lead to reduction of frustration.

The **Processing Speed Index** (PSI = 94; **Average** range) measures Ms. Cohn' ability to process visual information quickly, coordinate hand-eye movements, and discriminate important details. She performed better than approximately 34th of his peers on the processing speed tasks. Her performance was comparable on the 2 subtests of the PSI. Her performance was commensurate with peers which demonstrates evidence of typical processing speed and developmentally age-

appropriate fluency skills. This data suggests that she can sustain focus for adequate lengths of time to complete simple tasks accurately and efficiently just like their peers. These skills can contribute to their academic and professional fluency, particularly when under timed pressure to perform (e.g., tests). When processing speed is consistent with their other strengths and cognitive skills, individuals generally have the capacity to function efficiently and can demonstrate their skills rapidly and accurately when needed. At work, she is able to generally meet expectations for task completion and can handle routine tasks adequately, though they may not be the first to finish. In daily life, they are capable of handling common responsibilities like managing errands, organizing belongings, or responding to digital messages with sufficient speed, although occasional distractions or mental fatigue may cause temporary slowdowns.

Achievement Testing: Ms. Cohn's academic skills were assessed with the Wechsler Individual Achievement Test-Fourth Edition (WIAT-4). Her **total achievement score** fell in the **Extremely Low** range (standard score of 65; PR = 1; CI = 60-70).

**Language**

Ms. Cohn attained the following Language Composite and subscale scores:

| WIAT-4 Language | SS | %ile | Range | Descriptive Category |
|---|---|---|---|---|
| **Oral Language** | 90 | 25 | 81-99 | Average |
| **Listening Comprehension** | 98 | 45 | 85-111 | Average |
| Receptive Vocabulary | 120 | 91 | 104-136 | Very High |
| Oral Discourse Comprehension | 77 | 6 | 63-91 | Very Low |
| **Oral Expression** | **85** | **16** | **75-95** | **Low Average** |
| Expressive Vocabulary | 91 | 27 | 77-105 | Average |
| Oral Word Fluency | 99 | 47 | 86-112 | Average |
| Sentence Repetition | 78 | 7 | 66-90 | Very Low |

Ms. Cohn scored in the **Average** range on the **Oral Language Composite**, with subtest and subscale scores that comprise this measure varying significantly, from the **Very Low to the Very High** range.

*Receptive Language*: She scored in the **Average** range in the **Listening Comprehension Composite**, with subscale scores in the Very High and Very Low range. She scored in the **Very High** range on the **Receptive Vocabulary** and **Very Low** on the **Oral Discourse Comprehension** subtests. The Receptive Vocabulary subtest provides a non-verbal estimate of vocabulary skills, and the Oral Discourse Comprehension subtest measures the ability to process and recall auditory discourse.

*Expressive Language:* She scored in the **Low Average** range in the **Oral Expression Composite**, with subtest scores varying significantly, from **Very Low to Average** range. She scored **Average** range on a measure of expressive vocabulary, which required her to provide a specific one-word answer in response to an oral definition and/or picture (**Expressive**

**Vocabulary**). She scored in the **Average** range on a measure of verbal retrieval fluency, which required her to recall words by semantic category (**Oral Word Fluency**). She scored in the **Very Low** range on a measure of sentence repetition in which she had to repeat back increasingly lengthy sentences (**Sentence Repetition**).

## Reading

On the WIAT-4, Ms. Cohn attained the following Reading Composite and subscale scores:

| WIAT-4 Reading | SS | %ile | Range | Descriptive Category |
|---|---|---|---|---|
| **Total Reading** | 71 | 3 | 64-78 | Very Low |
| Reading Comprehension | 76 | 5 | 63-89 | Very Low |
| Word Reading | 67 | 1 | 61-73 | Extremely Low |
| **Basic Reading** | 68 | 2 | 64-72 | Extremely Low |
| Phonemic Proficiency | 69 | 2 | 61-77 | Extremely Low |
| Pseudoword Decoding | 66 | 1 | 60-72 | Extremely Low |
| **Reading Fluency** | 66 | 1 | 60-72 | Extremely Low |
| Oral Reading Fluency | 65 | 1 | 58-72 | Extremely Low |
| Orthographic Fluency | 73 | 4 | 65-81 | Very Low |
| Decoding Fluency | 65 | 1 | 58-72 | Extremely Low |

Ms. Cohn's **Total Reading Composite** is in the **Very Low** range. She scored in **Very Low** range on the measure of **reading comprehension**. She scored in the **Extremely Low** range on a measure of **sight-word recognition**.

She also scored just in the **Extremely Low** the **Basic Reading Index**, which is a composite measure of decoding skills. She scored in the **Extremely Low** range on a measure of auditory phonemic processing which required her to process, parse, and manipulate words by removing and replacing syllables or phonemes (**Phonemic Proficiency**). She scored in the **Extremely Low** range on a measure of visual, phonemic processing skills (**Pseudoword Decoding**).

She scored in the **Extremely Low** range on the **Reading Fluency composite**. She scored in the **Extremely Low** range on a measure of passage reading fluency, which required her to read two passages (**Oral Reading Fluency**). She also scored in the **Very Low** on a measure of sight-word reading fluency (**Orthographic Fluency**). She scored **Extremely Low** range on a measure of phonemic decoding fluency which required her to read a list of nonsense words as quickly as possible (**Decoding Fluency**).

## Written Language

On the WIAT-4, Ms. Cohn attained the following Written Language composite and subscale scores:

| WIAT-4 Writing | SS | %ile | Range | Descriptive Category |
|---|---|---|---|---|
| **Written Expression Composite** | 71 | 3 | 63-79 | Very Low |
| Spelling | 63 | 0.7 | 56-70 | Extremely Low |
| Essay Composition | 79 | 8 | 65-93 | Very Low |
| **Sentence Composition Composite** | 87 | 19 | 75-99 | Low Average |
| Combining Sentences | 85 | 16 | 72-98 | Low Average |
| Sentence Building | 94 | 34 | 79-109 | Average |

In the area of Written Expression, Ms. Cohn's **Written Expression Composite** fell in the **Very Low** range overall, with subtest and subscale scores varying from Average to Extremely Low. She scored in the **Extremely Low** range on a formal measure of spelling (**Spelling**). She also scored in the **Very Low** range on a formal measure of essay writing (**Essay Composition**). She scored in the **Low Average** range on the **Sentence Composition** composite, with subscale scores in the **Low Average to Average** range. She scored **Low Average** range on the sentence-combining subtest when she combined two simple sentences into compound sentences with a simple conjunction (and), and **Average** on the sentence-building when she wrote sentence that each include a target word.

## Arithmetic

On the WIAT-4, Ms. Cohn attained the following Mathematics composite and subscale scores:

| WIAT-4 Mathematics | SS | %ile | Range | Descriptive Category |
|---|---|---|---|---|
| **Mathematics Composite** | 71 | 3 | 65-77 | Very Low |
| Math Problem Solving | 74 | 4 | 66-82 | Very Low |
| Math Operations | 72 | 3 | 65-79 | Very Low |
| **Math Fluency** | 69 | 2 | 63-75 | Extremely Low |
| Math Fluency-Addition | 76 | 5 | 65-87 | Very Low |
| Math Fluency-Subtraction | 66 | 1 | 58-74 | Extremely Low |
| Math Fluency-Multiplication | 73 | 4 | 64-82 | Very Low |

Ms. Cohn's **Mathematics Composite** score is in the **Very Low** range. She scored in the **Very Low** range on a measure of mathematical knowledge and real-world problem solving (**Math Problem Solving**). She also scored in the **Very Low** range on a measure of her calculation skills

(**Math Operations**). Regarding math fluency, she struggled more in subtraction than in addition and multiplication problems.

**Orthographic Processing Composite**

Ms. Cohn's Orthographic Processing Composite refers to a group of subtests that measure her ability to recognize and process written words, particularly focusing on her sight vocabulary and ability to read irregular words quickly, essentially assessing her "spelling" skills at a visual level. This composite typically includes subtests like **"Orthographic Fluency"** which directly measures sight word reading speed which was in the **Very Low** range while her **spelling** measures her written spelling from dictation which was in the **Very Low** range.

| WIAT-4 Orthographic Processing | SS | %ile | Range | Descriptive Category |
|---|---|---|---|---|
| **Orthographic Processing Composite** | 68 | 2 | 62-74 | Extremely Low |
| Orthographic Fluency | 73 | 4 | 65-81 | Very Low |
| Spelling | 63 | 0.7 | 56-70 | Extremely Low |

**Dyslexia Index Composite**

The Dyslexia Index Composite comprises the Word Reading and Phonemic Proficiency subtests for students PK-3. Ms. Cohn's **Dyslexia Index** fell in the **Very Low** range and she scored in the **Extremely Low** range on the measure of sight-word recognition (**word reading**) and **Very Low** range on sight-word reading fluency (orthographic fluency), and **Extremely Low** range on the development of visual, phonemic processing skills (**pseudoword decoding**).

| WIAT-4 Dyslexia Composite | SS | %ile | Range | Descriptive Category |
|---|---|---|---|---|
| Dyslexia Index | 70 | 2 | 66-74 | Very Low |
| Word Reading | 67 | 1 | 61-73 | Extremely Low |
| Pseudoword Decoding | 66 | 1 | 60-72 | Extremely Low |
| Orthographic Fluency | 73 | 4 | 65-81 | Very Low |

<u>Executive Functioning</u>:  As there are concerns with Ms. Cohn' executive functioning (problems with concentration and working memory skills), the Comprehensive Executive Function

Inventory-Adult (CEFI-Adult) was administered to Ms. Cohn and her boyfriend (Travis Hailey). The CEFI assesses comprehensive assessment of executive functioning in adults 18 and older. It is composed of items related to attention, emotion regulation, flexibility, inhibitory control, initiation, organization, planning, self-monitoring, and working memory. Executive function has become an overall term for cognitive processes such as planning, working memory, attention, problem solving, reasoning, inhibition, mental flexibility, multi-tasking, initiation, and monitoring of actions. Ratings from Ms. Cohn on the CEFI Adult Self-Report Form yielded an overall **Full Scale score of 88**. This score falls in the **Low Average** range. She also provided a valid profile. Her ratings on several scales of the CEFI adult scales ranged from **Below Average to Average** range (74 to 100). Scales in the **Below Average** range were: **Organization** and **Initiation scales** (both considered her **weaknesses**), two scales (**Attention and Working Memory**) fell in the **Low Average** range. The rest of the scales (**Emotion Regulation, Flexibility, Inhibitory Control, Planning, and Self-Monitoring**) fell in the **average** range. She was low in a few aspects of executive functioning including the following: on **Attention scale** (scored 86), she was low on paying attention for a long time and is easily distracted; on **Inhibitory Control** (scored 92), she was low on showing and maintaining self-control and having trouble getting what she wants; on Initiation scale, she was low on starting tasks easily, needing for others to tell her to get started on tasks, fails to put tasks into action, especially without being asked; on Organization scale, she was low on having trouble finding things, doing things efficiently and neatly and doing things on time; on Planning scale, she was low on planning ahead, knowing what to do 1st, and preparing for upcoming events; and Working Memory scale, she was low on remembering instructions with many steps, following instructions well, and keeping goals in her mind. On the other hand, when her boyfriend Travis completed the CEFI regarding Ms. Cohn, he reported an overall **Full Scale score of 91**. This score falls in the **Average** range. There are some concerns regarding an inconsistent response style while a negative impression style was not indicated. Executive functioning scales that fell in the **Below Average** range included **Attention and Working Memory,** which are also considered to be her **weaknesses**. Other scales (**Flexibility and Organization**) fell in the **Low Average** range while all others (**Emotion Regulation, Inhibitory Control, Initiation, Planning, and Self-Monitoring**) all fell in the **Average** range.

Psychological, Adaptive and Parenting Functioning:  Objective and projective measures were administered to Ms. Cohn to assess her current psychological functioning including the Minnesota Multiphasic Personality Inventory-3rd Edition (MMPI-3), Symptom Checklist-90 Revised (SCL-90R), and Rotter Incomplete Sentences Blank. On the SCL-90R, her symptom profile revealed a pattern and magnitude that is considered to be in the clinical range while her symptomatic distress levels are clearly defined and also in the clinical range. Additionally, the overall intensity of her distress is somewhat elevated as she has endorsed many clinical symptoms. Then, when the Minnesota Multiphasic Personality Inventory-Third Edition (MMPI-3) was administered to Ms. Cohn, the test results were deemed as invalid due to high TRIN score (85T) suggesting fixed response pattern of consistently answering "True" to a lot of the test questions which appear to have led to higher "F" (presenting herself in unfavorable light). Then on the Rotter Incomplete Sentence Blank, several themes emerged including:  physical concerns (such as pain in body), challenges in communication, worries (such as losing her child, losing

hope), acknowledging both positive and negative outlooks (importance to enjoy life, regrets of previous relationship and not listening to others), and desire for normaly (wants to fix problems and go back to old life).

Activities of Daily Living:  In order to assess Ms. Cohn' current activities of daily living functioning, the World Health Organization Disability Assessment Schedule 2.0 (WHODAS 2.0) was administered. The WHODAS 2.0 is a generic assessment that evaluates health and disability that covers 6 domains of functioning including:  cognition, mobility, self-care, getting along with others, life activities: household activities and/or work or school activities, and participation (in community/society). Based on her own report, **domains** that fell in the **Moderate to Severe** range concerns included: **Participation in Society, Life Activities: Household Activities and Work or School Activities**; **domains** that fell in the **Moderate** range concerns include: **Cognition and Mobility**; while **Self-Care** fell in the **Mild to Moderate** range concern, and **Getting Along with People** fell in the **Mild** range concern. Then, when her mother completed the WHODAS 2.0 (via telephonic interview), she reported the following domains to be in the **Mild-Moderate** range concerns: **Cognition, Getting Along with People, Life Activities: Household Activities, and Participation in Society**; while **Mobility** fell in the **Mild** range of concern. She did not report any concern for **Self-Care and Life Activities: Work or School Activities (no issues reported).** Then, when her boyfriend (Travis) completed the WHODAS 2.0, he reported more concerns of higher severity than all adult respondents. For example, he reported the following domains to be in the **Severe** range of concerns: **Mobility and Life Activities: Household Activities;** while **Moderate** range of concerns were reported on **Cognition, Life Activities: Work or School Activities, and Participation in Society**. There were **Mild to Moderate** reported concerns on **Self-Care** while **no issues** detected in **Getting Along with People**.

Parenting functioning was assessed with the following measures:  Child Abuse Potential Inventory (CAPI), Sentence Completion Series (Parenting), and parent-child observation.

Parenting Abilities:  A couple of measures were administered to Ms. Cohn to assess current parenting skills. The Child Abuse Potential Inventory (CAP-I) was designed as a tool for screening for the likelihood for physical child abuse. Though Ms. Cohn has some issues with consistency in some of her responses, as there seems to be an attempt to present herself in a positive negative light. Her overall abuse score was low. Despite that, her subscale scores suggest that she sees more problems in her child and self, and her competency as to parent her child who may have physical problems.

**Child Abuse Potential Inventory (CAPI)**

| CAP-Inventory Indicators | What the indicator measures? | Problematic Score Range | Client's Raw Score |
|---|---|---|---|
| Distress | Represents client's feelings of frustration, sadness, loneliness, anxiety, confusion, rejection, and/or anger, often related to issues of personal maladjustment | >152 | 70 |

| Rigidity | Primarily represents rigidity in an individuals' attitudes towards appearance and behavior of their children (beliefs about being spotless, strict routines, and etc.) | >30 | 21 |
|---|---|---|---|
| Unhappiness | Suggests a general unhappiness with life, specifically related to difficulties in relationships (such as not having a good sex life, not being in love, and/or having close friends) | >23 | 16 |
| Problems with family | Deals with a variety of difficulties in the respondent's familial relationships | >18 | 6 |
| Problems with child and self | Identifies those clients who may perceive their children as generally having problems and who often see them as having physical problems. It also suggests a perception of limited ability and competency in their child and limited physical ability in the parent. | **>11** | **22** |
| Problems with others | Indicates general difficulties in their social relationships. | >20 | 14 |
| **Overall Abuse Score** | Indicates that the parent responded in a manner that is similar to known, active physical child abusers | >166 | 149 |
| Response index 1- faking good | Generally, represents attempts on the part of the parent to present himself or herself in positive manner | Valid/Invalid | Invalid |
| Response index 2- faking bad | Generally, represents attempts on the part of the parent to present himself or herself in a negative manner | Valid/Invalid | Valid |
| Response index 3- random response | Generally, represents attempts on the part of the parent respond in a haphazard manner | Valid/Invalid | Valid |

On the Sentence Completion Series (Parenting Form), several themes emerged including: her desire to be a loving, caring parent who is able to provide for her child's basic and emotional needs. She also talked about being a parent to her daughter as being positive experience. She also endorsed having an easy time communicating with her child due to her patience towards her child and her willingness to learn ASL.

Parent-Child observation: 10/15/2025 at the Tulalip Health Clinic (Mother and Child, R██████ C██-R███ were present for the current observation). Mother brought multiple items for the said appointment and they were led to the Behavioral Health conference rom. We started the session with mother taking out some of the items she had brought (such as coloring book) and asked R█████ to work on it with her. She asked her about the different colors and R████ knew her

different colors and mother gave her praise for it. Then, R████ was directing mother on where to color next on the coloring sheet. She smiled at mother during this activity and mother helped label what they were using at this activity (such as the name of the markers). Mother gave warning to R████ to use items appropriately. Then, mother proceeded to ask R████ if she wanted snacks and she responded with a "yes," and mother peeled her some oranges. Mother shared some background information regarding R████ including going to Preschool (Mukilteo School District; goes from 8:30 am to 1:30 pm), also has speech therapy 3x/per week (started speech services at 18 months). Mother also shared that there is no safety plan in place and thus, she isn't able to attend R████ medical appointments at this time. They continued with their activity while R████ was eating and tells Mother "I love you," and mother responds back to her (says "I love you" back). She shared her food with her mother (mother was feeding her as well). Mother shared that they have visits on Wednesday from Noon -5 pm and she has to be back at 6 pm at father's place. While they were playing mother labels the toys for her such as slinky, and tells her the different colors of the rainbow unicorn. R████ then decides to play the slinky with both her mother and this evaluator and was very playful. She got hurt when she was jumping by the window and mother was very responsive to check up on her. Before session was over, mother redirects her to pick up toys and R████ helped in the cleanup. Mother also tried to show R████ the bay of Tulalip, had reminded her to behave multiple times and redirected her several times.

## Summary, Diagnoses and Recommendations

Sabrina Gene Cohn, a 30-year-old, Native-American, single female, mother to one child, was referred for a psychological evaluation by her Tulalip health care provider (Dr. Jean Reid) to help aid in her diagnostic clarification. Ms. Cohn shared that she had an IEP from the Mukilteo School District beginning from Kindergarten to 12th grade and was also in speech classes. She added that Mariner High School had already destroyed her IEP records and the family records of her IEP was lost due to a house fire in 2015. She reported that her last evaluation was in 2013. She reported that she is currently dealing with Child Protected Services and is struggling in communicating with them, especially as they don't seem to understand "her with her child." When asked about current concerns, she reported: she has problems focusing, is easily distracted, problems with memory (has to be reminded at least 4x), has to slow down at times, and problems with comprehension."

Specifically, the current evaluation aims to answer the following questions:

### a. What is Ms. Cohn's current cognitive ability?

Ms. Cohn' general cognitive ability fell in the **Below Average** range of intellectual functioning. Individuals with closer to average Full Scale IQ scores tend to be equipped with the necessary cognitive skills to meet with success in a typical environment. In daily life, she is able to generally manage tasks like planning, decision-making, and problem-solving competently, but may need support when facing unfamiliar or complex challenges that require advanced critical thinking.

Her ability to reason out with **verbal skills** fell in the **very low** range. In everyday life, she is likely to have difficulties understanding nuanced language, such as sarcasm or implied meanings,

and expressing ideas in an organized or detailed way during social or practical conversations. Regarding **visual spatial skills**, she scored within the **average** range on the Visual Spatial Index which suggests that she possess typical abilities in visual analysis, pattern recognition, and spatial reasoning. In daily life, she can handle basic visual-spatial tasks like following directions, assembling products, or visualizing objects and spaces, though she may occasionally encounter challenges with highly detailed or intricate tasks, such as navigation in unfamiliar locations or working with complex visual instructions. Regarding her **fluid reasoning skills**, she scored within the **below average** range and suggests that she has typical abilities in problem-solving, logical thinking, and pattern recognition. In everyday life, she can solve routine problems and adapt to change, though she may occasionally find it more challenging to navigate unfamiliar situations or produce quick solutions without prior experience. With practice and support, she can improve her problem-solving abilities and strengthen her capacity for fluid reasoning. Regarding her **working memory abilities**, she scored in the **very low** range suggesting that it is difficult for her to retain newly learned auditory and visual information. For example, she may struggle to retain and manipulate verbal or numerical information in real time, especially when asked to do so under pressure or with distractions present. This can impact her ability to follow multi-step directions, perform mental arithmetic, or understand complex language structures. In everyday life, she might frequently forget names, dates, or tasks she intends to complete and may rely heavily on written notes, alarms, or reminders to manage daily responsibilities. Accommodations like breaking down tasks into smaller parts, using visual aids, or allowing extra time can significantly improve functioning and reduce frustration. Regarding her **processing speed abilities**, he scored in the **Average** range suggesting  that she can sustain focus for adequate lengths of time to complete simple tasks accurately and efficiently just like her peers. These skills can contribute to her academic and professional fluency, particularly when under timed pressure to perform (e.g., tests). When processing speed is consistent with their other strengths and cognitive skills, individuals generally have the capacity to function efficiently and can demonstrate their skills rapidly and accurately when needed. At work, she is able to generally meet expectations for task completion and can handle routine tasks adequately, though they may not be the first to finish. In daily life, they are capable of handling common responsibilities like managing errands, organizing belongings, or responding to digital messages with sufficient speed, although occasional distractions or mental fatigue may cause temporary slowdowns.

Given that Ms. Cohn had history of Special Education services throughout her academic year (from K-12th grade), achievement testing was done to assess her current academic functioning. In general, her achievement functioning fell in the Extremely Low range. In terms of language composite, it fell in the Average range, while her listening comprehension was around 7th grade level and oral expression was in the 8th grade level. Regarding Reading Composite, her reading comprehension is around 6th grade reading level. On Written Composite, it fell in around third grade to 7th grade level and on Math composite, it fell around 3rd (math problem solving) to 4th grade (numerical operations) level.

### b.  What are her mental health diagnoses?

At this time, Ms. Cohn meets criteria for Unspecified Depressive Disorder (F32.A),

Unspecified Anxiety Disorder (F41), and PTSD (F43.10; by history). Despite her current stressors, she has various support system that is helping manage her trauma, depressive and anxiety symptoms at this time.

Ms. Cohn has shared that there is a family history of dyslexia. A detailed analysis of her performance on each area is discussed:

Reading: Ms. Cohn has achieved **Extremely Low** in **word reading** and **Very Low** in **reading comprehension**. She has difficulties in sight-word recognition.
Spelling and writing: Ms. Cohn scored in the Very Low range overall. Her spelling skills are in the Extremely Low range. She has some challenges in combining sentences.
Phonological Processing: Ms. Cohn's overall phonological processing skills are in the Extremely Low range. These skills are necessary in the development of reading and spelling.
Co-occurring difficulties: Ms. Cohn has other mental health diagnoses and learning disabilities (SLD in reading) that are present.
As a result, at this time, it appears that Ms. Cohn meets criteria for **Dyslexia (F81.81)**.

    c.  **What are her strengths and weaknesses?**

**Strengths:**

1. Ms. Cohn several strengths at this time including active support system (parents and boyfriend).

2. She also has a stable employment.

3. She is very verbal and can be assertive at times.

4. She loves her daughter and wants to get the necessary support for her to ensure she is getting the appropriate care and support. As appropriate, it is important for her to be involved in her daughter's medical and academic decision-making.

5. She works hard in trying to teach her daughter by labeling things and showing effort and consistency as evident in the parent-child observation. It would be important for her to continue doing this to help support language development in her daughter.

6. Her daughter and Ms. Cohn appear to be well-bonded based on how Raven responded to her mother (saying "I love you," sharing her food, and responding to redirections from mother).

7. She is aware of her cognitive limitations.

8. She has good initiation skills and gets the necessary services activated for herself and daughter.

8. Continue to take psychiatric medications. Consult with doctor for any side effects.

**Areas of improvement:**

1. There are a few measures that indicated Ms. Cohn's struggle to try and present herself in a good manner or potentially to exaggerate her symptoms. To get the most accurate description of

her current situation, it is important for Ms. Cohn to open up to a provider that she trusts so she can work on issues that is related to her trauma history as well as depressive and anxiety symptoms.

2. Problems with reading comprehension. To support her, accommodations such as providing both written and verbal instructions, offering extended time for reading and writing tasks, and checking for understanding through rephrasing can help ensure comprehension. Modifying tasks by simplifying language, reducing the linguistic complexity of questions, or providing choices in how to demonstrate understanding can also help level the playing field. These supports aim to build confidence in comprehension over time.

3. Problems with working memory. Thus, she might frequently forget names, dates, or tasks she intended to complete and may rely heavily on written notes, alarms, or reminders to manage daily responsibilities. Accommodations like breaking down tasks into smaller parts, using visual aids, or allowing extra time can significantly improve functioning and reduce frustration.

4. Ms. Cohn's assertiveness especially when she doesn't get her way can be seen as detrimental at times. It would be helpful for her to learn to express her needs and wants in a healthier and respectful manner.

5. To improve her initiation skills:

> Create routines for her on tasks/activities that she has difficulty initiating.
> Start tasks early to give her enough time to overcome difficulties with initiation.
> Reduce time constraints that might discourage her from starting the activity/task.
> Create cues that she can use without the presence of others.

6.. To improve her organization skills:

> Create to do lists.
> Schedule time.
> Prioritize your lists.
> Avoid multi-tasking.
> Organize materials.

7. When communicating with Ms. Cohn, it is preferred to use visual aids to help increase her attention and use of different modalities will yield better success of her comprehension.

It has been a pleasure to work with Ms. Cohn and her family. If you have any questions regarding this report, please feel free to obtain the necessary signatures on releases of information/ appropriate consents to exchange information, and then telephone 360-716-4511.

_Shellah Imperio, Ph.D._
Shellah Imperio, Ph.D.
Lead Licensed Psychologist

Sabrina G. Cohn, DOB: ▓▓▓▓▓▓

Sabrina Conn
404 101st Ave SE E35
Lake Stevens WA 98258



700 Stewart St.
Seattle WA 98101

FILED
LODGED
RECEIVED

MAIL

JAN 14 2026

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY